# EXHIBIT A

VIRGINIA:

## IN THE CIRCUIT COURT OF THE CITY OF RICHMOND
### John Marshall Courts Building

**CORY ALEXANDER,**

**ALEXANDER ENTERPRISES #1, LLC**

**THE ALEXANDER FAMILY REVOCABLE TRUST**

$\qquad$ **Plaintiffs,**

**v.** $\qquad$ Case No. **CL10-2529**

**BANK OF AMERICA, N.A.,**
$\quad$ SERVE: $\quad$ CT Corporation System
$\qquad\qquad\quad$ 4701 Cox Road, Suite 301
$\qquad\qquad\quad$ Glen Allen, Virginia   23060-6802

**RENEE JOHNSON,**
$\quad$ **SERVE:**

**and**

**BYRON MOBLEY,** $\qquad$ **Defendants.**

$\quad$ **SERVE:**

## AMENDED COMPLAINT

$\qquad$ Plaintiffs, Cory Alexander ("Mr. Alexander"), Alexander Enterprises #1, LLC ("Alexander Enterprises") and the Alexander Family Revocable Trust (the "Trust"), by counsel, aver the following for their Complaint in the above-styled case.

## INTRODUCTION

Mr. Alexander was a client of U.S. Trust, Bank of America Private Wealth Management ("Bank of America" or "Bank")[1] from approximately July 2003 until October 2009.[2]   At the beginning of his relationship with Bank of America, Mr. Alexander was financially stable and a multi-millionaire.   Mr. Alexander retained Bank of America to provide him with competent advice and assistance with handling his business and financial affairs.

However, instead of growing and securing Mr. Alexander's financial portfolio as promised, Bank of America became increasingly concerned with advancing its own pecuniary interests over the course of its relationship with Mr. Alexander which led the Bank to engage in a course of self-dealing which manifest itself in the promotion and ultimately the implementation of grossly negligent wealth management decisions by Mr. Alexander's private wealth management team which included defendants Byron Mobley ("Mobley") and Renee Johnson ("Johnson").   Defendants' willful and grossly negligent misconduct was in complete derogation of the contractual and common law fiduciary duties they owed Mr. Alexander.   Defendants' actions were also in violation of the standards applicable to professionals and financial institutions providing the type of private wealth management services that were purportedly being rendered to Mr. Alexander at all times relevant to this lawsuit.

## FACTS

1.      Mr. Alexander became a customer of Bank of America in July 2003 after leaving Wachovia/First Union ("Wachovia").   Mr. Alexander's prior exclusive banking relationship with

---

[1] Upon information and belief, U.S. Trust, Bank of America Private Wealth Management operates through Bank of America, N.A. and other subsidiaries of Bank of America Corporation.

[2] As alluded to below, Mr. Alexander entered into two service agreements with the Bank on behalf of Alexander Enterprises and the Trust; accordingly, these two entities are also plaintiffs herein.  Mr. Alexander acted on behalf of these entities at all times relevant.

Wachovia began soon after he signed a $13 million contract to play professional basketball with the National Basketball Association ("NBA") in January 1999.

2.      Mr. Alexander ultimately became dissatisfied with Wachovia due to what he believed to be the Bank's failure to assist him develop a long term wealth management and investment strategy that would generate sustainable wealth beyond the conclusion of his NBA career.

3.      Although reputable financial institutions such as SunTrust, BB&T, and First Market Bank actively recruited Mr. Alexander, he decided to establish a banking relationship with Bank of America based upon its representations and assurances regarding the superior abilities of its wealth strategists, who the Bank promised would be dedicated to assisting Mr. Alexander with the development of his financial and related business interests.  To facilitate these noble endeavors, the Bank assured Mr. Alexander that he would be receiving a heightened level of personal service and attention from the members of his wealth management team which was to be headed by Leslie Doyle ("Ms. Doyle"), who was assigned as Mr. Alexander's Private Client/Wealth Manager.  Bank of America owed Plaintiffs a fiduciary duty at all times relevant.

4.      At the outset of his relationship with Bank of America, Mr. Alexander's assets totaled approximately $7.5 million. Mr. Alexander's individual net worth made him an attractive client to Bank of America who, at that time, was attempting to expand its clientele to include professional athletes.

5.      Bank of America believed Mr. Alexander "[represented] a great referral opportunity for other professional athletes." Consequently, in an effort to secure Mr. Alexander's business and thereby increase the Bank's potential pipeline of high net worth athlete clients, Ms. Doyle and others entrusted with the responsibility of recruiting Mr. Alexander made errant

3

representations and omitted critical facts with respect to the breadth and overall benefits of the Bank's private wealth management services that they knew or should have known to be false and/or misleading at the time.

6.      Bank of America aggressively recruited Mr. Alexander and ultimately secured his business by assuring him that its private wealth management professionals would:

- become intimately familiar with his specific financial needs and objectives, and would provide him with competent professional advice concerning his financial resources;

- guide and support his efforts to manage his various businesses efficiently and effectively, which included Cory Alexander Rims Racing Sound and Security ("CARRSS"), Cory Alexander Motorsports ("Motorsports"), Alexander Holdings, LLC ("Alexander Holdings"), and Alexander Enterprises 1-4;

- ensure that he obtained personal and commercial loans from Bank of America to properly manage and maintain his assets and businesses; and

- assist him in developing and maintaining a reliable source of income following his retirement from professional basketball.

7.      In reliance upon these representations and assurances with respect to Bank of America's overall commitment to preserving and enhancing his financial assets, Mr. Alexander executed a Private Bank Investment Services Agreement on or about July 24, 2003 on behalf of the Trust, entrusting Bank of America to provide the financial management services promised therein among others.

8.      Meanwhile, Bank of America representatives were steadily assessing Mr. Alexander's value as a private wealth management client, remarking how the Bank would benefit from Mr. Alexander's need for business and personal loans as well as from the extensive

4

amount of cash that Mr. Alexander would have on deposit in his personal and corporate checking accounts.

9.      Accordingly, shortly after securing Mr. Alexander's business, Bank of America extended Mr. Alexander a $1.5 million line of credit ("LOC") to pay off his existing line of credit with Wachovia and to provide him with capital to expand his business ventures, which, as alluded to above, included a number of automotive and real estate businesses.

10.     On or about November 5, 2003, Mr. Alexander executed a promissory note to extend the existing LOC from $1.5 million to $2 million (the "Promissory Note"), which was secured by the securities in Mr. Alexander's trust account (the "Trust") which were valued at over $3 million at that time.

11.     Under the terms of the Promissory Note, Mr. Alexander was required to make interest-only payments each month at the rate of 2.1% - 3.4%, which amounted to approximately $3,400 per month, until the maturity date of the loan on November 14, 2004. On the date of maturity, Mr. Alexander was required to pay off the principal balance and any remaining accrued interest. Although Mr. Alexander was only required to make monthly, interest-only payments on the LOC, he often made principal payments in an effort to keep the accrued interest at a minimum.

12.     The monthly LOC interest payments were automatically withdrawn from a Bank of America business checking account that was set up for Alexander Holdings, the entity which owned all of Mr. Alexander's various business enterprises. The formation of Alexander Holdings allowed Mr. Alexander to combine all of his business income and losses and report them on his individual income tax returns. The members of Mr. Alexander's wealth management team knew or should have known that Mr. Alexander implemented this reporting

5

strategy at the advice of his personal accountant and legal advisors so that he could offset any business losses that he incurred against his lucrative NBA earnings.

13.     On November 19, 2003, Mr. Alexander executed another Private Bank Investment Services Agreement with Bank of America on behalf of Alexander Enterprises giving Bank of America managerial responsibility over the business banking account for Alexander Holdings as well as a building that Mr. Alexander owned at 4300 West Broad Street in Richmond, Virginia (the "Broad Street Building").[3] Bank of America and Mr. Mobley served as the property management agents for the Broad Street Building at all times relevant.

14.     Alexander Enterprises owned the Broad Street Building.  Mr. Alexander formed Alexander Enterprises solely to hold title to the building while his two other automotive companies, CARRSS and Motorsports, operated there.

15.     Mr. Alexander agreed to pay Bank of America $1,000 per month in exchange for Bank of America's property management of the Broad Street Building.  In exchange for the $1,000 per month property management fee, Bank of America promised, in writing, that Mobley would provide services regarding the Broad Street Building and Mr. Alexander's other real estate assets.   Mobley's duties included "[e]stablishing sales prices, negotiating contracts, [and] responding to offers" related to the Broad Street Building.  Concomitant therewith, Mobley had a fiduciary, contractual and professional duty to share all purchase offers or inquiries regarding the Broad Street building with Alexander.

16.     In reliance upon these express promises, Mr. Alexander paid Bank of America in excess of $70,000 in property management fees over the course of the parties' relationship.

---

[3] The Private Bank Investment Services Agreements executed on July 24 and November 19, 2003 shall be collectively referred to hereinafter as the "Service Agreements".

17.     While managing the Broad Street Building, Bank of America set monthly rents for CARRSS and Motorsports that were automatically drafted from separate business banking accounts specifically established for these two enterprises.

18.     Prior to purchasing the Broad Street Building, Mr. Alexander entered into an arrangement to lease a portion of the property to Budget Rental Car ("Budget"). Accordingly, as part of its managerial responsibilities, Bank of America also agreed to collect rent from Budget and service Budget's tenant needs.

19.     From the outset of his relationship with Bank of America, Mr. Alexander continuously expressed his position that the profitable operation of CARRSS and Motorsports was only tangential to his overall long term investment strategy.

20.     Mr. Alexander repeatedly advised Mobley and the other members of his wealth management team that his primary focus was Alexander Enterprises, his real estate investment company, which he believed had the greatest earning potential based on what he paid for the Broad Street Building in 2001. Mr. Alexander anticipated realizing a significant profit when he sold the Broad Street building.

21.     Mr. Alexander repeatedly shared with Mobley and the other members of his wealth management team his envisioned "best case scenario" of selling the Broad Street Building to a large corporation for a considerable profit. Mr. Alexander directed Mobley to market the Broad Street Building to such potential buyers.

22.     Mobley and the other members of Mr. Alexander's wealth management team were fully apprised of Mr. Alexander's desire to develop a lucrative real estate portfolio, an endeavor that all involved knew or should have known was contingent upon the profitable disposition of the Broad Street Building.

7

23.    From the outset, Mr. Alexander advised Mobley and the other members of his wealth management team that CARRSS and Motorsports were primarily created to provide Mr. Alexander's father, who managed the businesses, with a meaningful employment opportunity and a steady source of income.   Defendants knew Mr. Alexander intended for the businesses to shelter his NBA income from taxes to the extent the businesses operated at a net loss.

24.    Although Mr. Alexander believed that there was a possibility of franchising CARRSS and Motorsports at some point in the foreseeable future, he made it absolutely clear to Defendants that he did not wish to stake his financial future on the profitability of these businesses.   Rather, he intended for the businesses to improve the Broad Street Building, enhance its value and attract other potential buyers or tenants while providing a job for his father and tax shelter for his NBA income.

25.    Mr. Alexander's primary focus in 2003 was the real estate that he owned, which was evident by the fact that he listed the Broad Street Building that year for a brief period of time to test the market.   At all times relevant, he directed Mobley to market the Broad Street property to potential corporate buyers.

26.    By housing CARRSS and Motorsports in the Broad Street Building, Mr. Alexander intended to occupy and enhance the value of the property through the creation of positive cash flow from rental income and aesthetic improvements.   Mr. Alexander believed these owner-occupier enhancements would attract prospective buyers and businesses to invest in or locate to other properties in the immediate vicinity.   Nevertheless, Mr. Alexander repeatedly advised Mobley he would be willing to relocate CARRSS and Motorsports to a smaller, less costly location if necessary to facilitate the profitable sale of the Broad Street Building.

8

27.    In the summer of 2004, Mr. Alexander sold two homes that he owned in the Richmond area to provide him with the funds needed to build a new home for his family on a vacant lot that he had previously purchased in 1999 in the Rivergate subdivision of Goochland County.

28.    However, by this time Mr. Alexander had been out of the NBA for about three years and the salary he was receiving from his contract buyout was coming to an end. Accordingly, Bank of America was not willing to lend Mr. Alexander the money needed to build his home forcing Mr. Alexander to explore other financial options.  Mr. Alexander eventually sold the lot he had purchased in the Rivergate subdivision for a net profit of approximately $500,000 which he applied to the purchase of a house in Goochland County in July 2005.

29.    The house Mr. Alexander purchased needed renovations to make it habitable, so in September 2005, Bank of America extended Mr. Alexander and his wife a home equity line of credit ("HELOC") in the amount of $250,000 to fund the necessary renovations and purchase a one acre parcel of land adjacent to Mr. Alexander's home.

30.    Mr. Alexander and his wife separated shortly after Mr. Alexander purchased his home and Bank of America extended the HELOC.

31.    Meanwhile, in the fall of 2004, Ms. Doyle's promotion by Bank of America required her to relocate to the Bank's office in Norfolk, Virginia. After Ms. Doyle's departure, Mr. Alexander informed the Bank that he was considering moving his business to another banking institution due to his growing disappointment with his overall experience with the wealth management services Bank of America had provided.

32.    Bank of America did not acknowledge Mr. Alexander's professed disappointment with its services until learning of his impending return to the NBA for the 2004-2005 Season.

Thereafter, Bank of America persuaded Mr. Alexander to remain a customer by agreeing to allow Ms. Doyle to remain his private client manager, although she was physically located in the Bank's Norfolk office. That said, while Mr. Alexander's Trust Officer remained the same, his portfolio manager changed constantly and his relationship with his wealth strategist became non-existent.

33.     Soon after convincing Mr. Alexander to remain a customer, Ms. Doyle was promoted again and pulled off of Mr. Alexander's accounts. Bank of America reassigned its oversight and management of Mr. Alexander's portfolio to Johnson who also worked in Bank of America's Norfolk office. From this point forward, Johnson served as Mr. Alexander's private wealth manager. Following the departure of Ms. Doyle, the quality of service and individualized attention Mr. Alexander's portfolio received further diminished.

34.     The services Defendants provided to Mr. Alexander diminished even further when Mr. Alexander stopped playing professional basketball in October 2005. Defendants should have known the end of Mr. Alexander's professional basketball career would materially change his financial status as he would no longer be able to rely upon the significant income he derived playing basketball. Defendants failed to advise Mr. Alexander how he should adjust to these changed circumstances and, consequently, he withdrew cash from his trust account to support his businesses, general living expenses and cover the interest payments on the LOC, which at this time was completely exhausted. This material change in circumstances should have prompted Defendants as Mr. Alexander's registered investment advisor, wealth manager and property manager to advise Mr. Alexander to make changes to his wealth management strategy and realign his portfolio accordingly. As his registered investment advisor, wealth

management strategist and property manager, Defendants owed Mr. Alexander contractual, professional and fiduciary duties at all times relevant.

35.    Despite the exhaustion of the LOC, Defendants, as Mr. Alexander's wealth management strategist, property management advisor and registered investment advisor, willfully failed to advise Mr. Alexander to sell some or all of his securities and other assets to reduce or extinguish his debt service obligations.  As Mr. Alexander's registered investment advisor, property manager and wealth management strategist, the standard of care applicable to all professionals within these fields required Defendants to act prudently and put Mr. Alexander's interests above their own interests among other things.  Instead, Defendants put their interests above Plaintiffs' interests as evinced by, among other things, the Bank's repeated extensions of the maturity date on the Promissory Note tied to the LOC and continuous withdrawal of funds from the Alexander Holdings account to pay accruing interest (approximately $10,000 per month at this juncture) on the unpaid LOC balance.

36.    Meanwhile, Mr. Alexander continued to use available funds from the HELOC to complete the renovations to his home in Goochland.  Bank of America and Johnson led Mr. Alexander to believe the money he expended to renovate and enhance the value of his home would enable him to refinance the property and withdraw cash to use to payoff other loan obligations for which he had less favorable credit terms.  Bank of America and Johnson should have advised Mr. Alexander against this strategy in comport with their contractual and fiduciary duties and applicable professional standards.

37.    At this time, Bank of America sought to increase the significant interest income Mr. Alexander was paying on both the HELOC and LOC by extending Mr. Alexander more home equity credit by refinancing his mortgage once his home renovations were complete.

11

38.     As Mr. Alexander's registered investment advisor and wealth management strategist the Bank and Jonson were obliged by their contractual and fiduciary duties and the applicable standards of professional care to advise Mr. Alexander to pay off the balance of the LOC with the available cash from his securities account. These defendants willfully deviated from said standards and instead advanced their own interests vis-a-vis the Bank's extension of more credit to Mr. Alexander to pay the interest on the preexisting lines of credit the Bank had already extended him. Rather than satisfying their contractual, fiduciary and professional obligations, the Bank, Johnson and Mobley withheld prudent professional advice to render Mr. Alexander a valuable and lucrative perpetual borrower.

39.     Despite the uncertainty of Mr. Alexander's financial situation, Defendants failed to advise him of any plausible cost containment solutions or similar advice to preserve his financial resources. Rather, Defendants placed Mr. Alexander in the untenable position of having to borrow his way out of debt.

40.     In November 2005, Mr. Alexander's father, who was in charge of CARRSS' daily business operations, suffered a stroke and was unable to perform his managerial duties.

41.     Due to this unfortunate reality and material change in circumstances, Mr. Alexander was required to spend the majority of his time with his father at the hospital in a caretaker capacity. Meanwhile, CARRSS was losing money at a fairly significant rate as a result of Mr. Alexander's and his father's inability to manage the business.

42.     Due to these extenuating and material changes in circumstances and pursuant to Mr. Alexander's request, Bank of America listed the Broad Street Building for sale again in December 2005.

43.    On or about January 31, 2006, Bank of America received a non-binding letter of intent from WAWA, Inc. ("WAWA") to purchase the Broad Street Building.

44.    The letter of intent stated WAWA's interest in acquiring the property for $2,000,000 subject to certain qualifications and conditions which included WAWA's completion of its initial due diligence (i.e., title search, site plan and survey, environmental survey and analysis) prior to the execution of a purchase contract, which would have preceded WAWA's acquisition of the necessary zoning and permit approvals for the construction and use of a twenty-four (24) hour convenience store on the property.

45.    In its letter of intent, WAWA offered to pay a $3,000 non-refundable deposit to compensate Mr. Alexander for keeping the property off the market during the initial due diligence period. WAWA also offered additional monetary deposits to compensate for any additional amount of time that it may need to keep the property off of the market to complete its due diligence. These offers demonstrate WAWA's serious interest in purchasing the property for $2,000,000 and show that the sale was reasonably certain to occur because these contingencies would have been satisfied. For example, on information and belief, WAWA had already completed a crime survey as well as some other preliminary due diligence prior to sending the non-binding letter of intent to its regional broker for submission to Mobley and Bank of America.

46.    On information and belief, WAWA had a heightened interest in the location of the Broad Street Building and would have been amenable to agreeing to terms more favorable to Mr. Alexander to shore up its right to purchase the property had Mobley and the other members of Mr. Alexander's wealth management team at Bank of America been more diligent in their efforts to negotiate on Mr. Alexander's behalf.

47.     WAWA's willingness to pay a non-refundable deposit should have caused Mobley and the other pertinent members of Mr. Alexander's wealth management team to realize WAWA was interested in acquiring the Broad Street Building for $2,000,000 or more.

48.     Although Mobley made Mr. Alexander aware of the letter of intent, he did not adequately inform Mr. Alexander of the significance of the financial incentives WAWA offered to facilitate the completion of its requisite due diligence.

49.     The terms of the Services Agreement and the applicable professional standard of care  obligated Mobley to respond to WAWA's offer.   Mr. Mobley failed to respond to WAWA's letter of intent in willful violation thereof.

50.     Mobley advised Mr. Alexander against WAWA's proposal on the misguided assumption WAWA would tie up the Broad Street Building for an excessive period of time without providing Mr. Alexander adequate assurance that the transaction would ultimately come to fruition.

51.     To truncate further negotiations with WAWA, Mobley falsely advised the listing broker for the Broad Street Building that the mortgage lender, Consolidated Bank & Trust Company ("Consolidated"), would not authorize Mr. Alexander to enter into a purchase contract with WAWA as it would take too long to close the sale transaction.   Mobley's willful misrepresentations in this regard were false, as no representative of Consolidated was ever notified of WAWA's letter of intent or interest in acquiring the Broad Street Building.

52.     Mobley's false assertions with respect to Consolidated's purported concerns about the WAWA proposal were devoid of merit because Mr. Alexander did not need authorization from Consolidated to sell the Broad Street Building for $2,000,000. Mr. Alexander's mortgage payments were current and his loan with Consolidated was in good standing. On information and

14

belief. Mobley falsely represented that Consolidated would not authorize the prospective sale to purposefully steer WAWA away from the deal and extend Mr. Alexander's property management arrangement with the Bank.

53.     Mobley's tortious acts and omissions with respect to the WAWA proposal were grossly negligent and in willful violation of the contractual obligations and professional standards that he and the Bank owed Mr. Alexander.

54.     Mobley's lack of diligence and affirmative misrepresentations regarding the WAWA offer is particularly disheartening considering that both he and the other members of Mr. Alexander's private wealth management team knew Mr. Alexander's long term financial stability following his retirement from professional basketball was contingent, in large part, upon his ability to sell the Broad Street Building to a lucrative buyer.

55.     Over the next eighteen (18) months, Mr. Alexander did not receive any viable offers for the purchase of the Broad Street Building.  Consequently, Mr. Alexander continued to utilize the money in his trust account to pay his living expenses, business-related expenditures and the costs to maintain the Broad Street Building.

56.     Mr. Alexander was also compelled to suspend any efforts to renovate his home in Goochland as he was going through a highly contested divorce and custody battle with his wife.

57.     The divorce proceedings placed a significant strain on Mr. Alexander's finances, and in order to maintain joint custody of his son, Mr. Alexander forfeited opportunities to play professional basketball overseas.  Defendants did not consider this change of circumstances when advising Mr. Alexander regarding his long-term financial situation in gross violation of their contractual and fiduciary obligations and applicable professional standards.

58.    Instead, on or about July 2007, Bank of America alerted Mr. Alexander that the funds in his trust account were dwindling and that as a result a margin call for the LOC would soon be approaching.

59.    Meanwhile, on August 3, 2007, Christine Thomas, a member of Mr. Alexander's wealth management team, sent Mr. Alexander's attorney an e-mail advising that Bank of America needed to "rearrange [Mr. Alexander's] financial picture" until Mr. Alexander could sell the Broad Street Building and stabilize his financial situation.

60.    To achieve this endeavor, Bank of America requested that Mr. Alexander's attorney prepare the necessary documents to allow Bank of America the authority to liquidate the dwindling assets in Mr. Alexander's trust account and transfer the funds into a money manager account to provide Mr. Alexander with immediate access to needed capital.

61.    In light of Bank of America's efforts to liquidate his trust account, Mr. Alexander sent an e-mail on August 7, 2007, to Johnson inquiring about the possibility of "paying [the LOC] down," which had been exhausted since October 2005.  In his e-mail, Mr. Alexander stated that "it really [didn't] make much [sense] for [him] to continue to hold on to a $2 [million] line of credit."  Mr. Alexander specifically inquired as to whether there would be any penalty for paying off the LOC as he "[did not] want to continue to pay over $10K [in interest] a month for money that [he could not] use."  Johnson did not reply to Mr. Alexander's e-mail inquiry in violation of her and the Bank's contractual and fiduciary obligations to Mr. Alexander and applicable professional standards.

62.    On August 17, 2007, Mr. Alexander and his accountant, Steve Piascik ("Mr. Piascik"), attended a meeting at Bank of America with representatives from both the Bank's Richmond and Norfolk branch offices including Ms. Doyle, Johnson and Mobley.  During the

meeting, Mr. Alexander discussed his divorce settlement as well as his plans for shoring up his financial situation which, at that point, required he sell the Broad Street Building or refinance his house in Goochland to obtain the cash necessary to meet his routine debt obligations. Moreover, Mr. Alexander deemed it imperative to eradicate the exorbitant monthly interest he was paying on the LOC.

63.     During the meeting, Mr. Alexander took the opportunity to ask Johnson in person about the question he raised in his August 7, 2007 email, concerning his ability to utilize the funds in his trust account to pay off the LOC.  Johnson advised Mr. Alexander that the trust account funds would need to remain in tact so that Mr. Alexander showed adequate income and available cash reserves on hand to qualify to refinance his Goochland home.  Mr. Alexander relied upon Ms. Johnson willful misrepresentations in this regard.

64.     Johnson's response led Mr. Alexander to believe that refinancing his home in Goochland would be the Bank's first objective in shoring up his financial situation.  Bank of America's representatives at the meeting set a target date of November 15, 2007, to complete the steps necessary to refinance Mr. Alexander's Goochland home as Mr. Alexander had financial obligations stemming from his divorce settlement that needed to be resolved soon thereafter.

65.     Mr. Alexander advised his wealth management team that he needed cash to pay his divorce settlement and also needed to pay off the balance of the HELOC in the amount of $250,000 so that his ex-wife would no longer be jointly responsible for repayment of the loan. Accordingly, by e-mail dated August 24, 2007, Johnson assured Mr. Alexander that Bank of America "[would] try [its] best" to effectuate a home refinancing arrangement.

66.     Johnson then advised Mr. Alexander by e-mail dated August 27, 2007, that Bank of America would consider offering him a mortgage on his home at seventy percent (70%) loan

to value and gave Mr. Alexander the name of the contact person at the Bank to initiate the mortgage loan process.

67.    Mr. Alexander replied to Johnson by e-mail that same day advising that he was amenable to the proposed loan to value ratio. Mr. Alexander also advised that he had procured a copy of his credit report and felt compelled to resolve some outstanding debt obligations before initiating the mortgage loan process, unless Johnson felt that such action would not be necessary.

68.    Mr. Alexander also inquired as to when cash would be made available from the liquidation of his trust account so that he could "take care of the LOC and [other] outstanding issues."

69.    Johnson advised Mr. Alexander to pay his outstanding debts to facilitate the refinancing arrangement and further advised that cash from the trust account would be available before the end of that week.

70.    With the liquidation of his trust account in motion, Mr. Alexander felt compelled to inquire yet again about whether he could take the proceeds from the account and "apply the majority of it to the $2 [million] LOC to knock the balance down." Johnson replied that Bank of America had "decided that it made sense to put [Mr. Alexander's funds] in a CD and still keep [Mr. Alexander's] line of credit." This self-serving advice is indicative of Johnson's and the Bank's misguided efforts to place their interests ahead of Mr. Alexander's in gross violation of these defendants' contractual and fiduciary obligations and the professional standards applicable to those in the financial services industry.

71.    Johnson willfully misrepresented to Mr. Alexander that Bank of America consulted Mr. Piascik regarding its recommendation to convert the funds to a CD and he agreed with it. Mr. Piascik denies that any such conversation ever transpired. To the contrary, Mr.

Piascik's denies being consulted by Bank of America regarding this decision but recalls Bank of America unilaterally deciding it would terminate its relationship with Mr. Alexander if he were to pay off the LOC.

72.     Alternatively, Mr. Alexander queried Johnson about the possibility of using the proceeds from his home refinance to apply to the LOC to reduce the monthly interest payment. Johnson suggested that this idea may be plausible and that it may be best for Mr. Alexander to discuss this option with Mr. Piascik.

73.     On September 4, 2007, Mr. Alexander was advised that his trust account funds were available to him in a newly established money manager account. There was over $2.3 million in the new account, $2 million of which was in the form of a certificate of deposit which, as per Ms. Johnson's admonition, could not be withdrawn because it secured the LOC.

74.     To justify its repeated deterrence of Mr. Alexander's efforts to pay off the LOC, Johnson and Bank of America advised Mr. Alexander that, due to his lack of income, he needed cash in the Bank in order to collateralize the refinance of his home.

75.     Meanwhile, Mr. Alexander used the disposable cash in his money manager account to resolve outside debts in order to refinance his home. He also took care of the payments, legal fees and related costs associated with his divorce settlement as well as invested in further home improvements to enhance the value of his property for purposes of refinancing in reliance upon Johnson and Bank of America's promise to refinance his home mortgage thereafter.

76.     Mr. Alexander's investment advisors were well aware of these expenditures and encouraged him to utilize the cash available in his money manager account for these purposes.

19

77.    In December 2007, Bank of America appraised Mr. Alexander's home for $950,000. According to Bank of America's appraisal, Mr. Alexander had $700,000 in home equity, as the only encumbrance against the property was the HELOC. Bank of America's appraised value of Mr. Alexander's home did not include the value of an adjacent one acre parcel that Mr. Alexander owned free and clear of any liens.

78.    Bank of America denied Mr. Alexander's refinance loan application a little later in December 2007 notwithstanding the amount of equity in Mr. Alexander's home and the Bank's and Johnson's prior assurances regarding Mr. Alexander's receipt of approval for refinancing.

79.    Bank of America's ostensible reason for denying the loan was the inadequacy of Mr. Alexander's income which cannot be reconciled with the grossly negligent advice Mr. Alexander was receiving throughout the entire process from Johnson. The sole reason Mr. Alexander did not pay off the LOC with the funds from his trust account was so that he could have adequate cash on reserve to qualify for a refinanced mortgage loan.

80.    By January 2008, Mr. Alexander was able to secure a loan from Wachovia to pay off the HELOC with Bank of America. By mid-February 2008, he paid off the LOC from the funds in his money manager account. Between August 2007 and mid-February 2008, Mr. Alexander incurred substantial finance charges on the LOC that he would not have incurred had he paid it off in August 2007. Mr. Alexander delayed paying off the LOC as a direct result of Defendants' willful violations of their contractual and fiduciary obligations and the applicable professional standards governing the provision of wealth and property management services.

81.    By mid-February 2008, Mr. Alexander did not have sufficient funds remaining in his money manager account, or elsewhere, to pay Bank of America the interest fees that had

20

continued to accrue from the LOC. These interest fees were automatically withdrawn from the Alexander Holdings account during the time Mr. Alexander was awaiting approval of his refinance loan application. The Alexander Holdings account did not have sufficient funds to cover the interest payments and consequently Bank of America was applying overdraft fees to the account unbeknownst to Mr. Alexander.

82. Once the LOC interest and overdraft fees accrued to approximately $84,000, Bank of America contacted Mr. Alexander and recommended he convert these fees into a loan that Mr. Alexander would pay in full upon the sale of the Broad Street Building. The $84,000 in interest fees from the LOC and overdraft fees were converted into a loan in April 2008.

83. Because the Broad Street Building had not sold due to the Bank's and Mobley's gross violation of their contractual and common law duties, the Bank began to pressure Mr. Alexander to pay additional money to extend the due date of the loan. However, by this time, Mr. Alexander was in extreme financial distress and did not have the funds to renew the loan terms, which would extend the due date.

84. Bank of America's denial of Mr. Alexander's mortgage loan application caused him severe financial problems as it left him cash poor and unable to take care of mounting business and personal debts. Mr. Alexander's financial problems were exacerbated by the grossly negligent and self-serving financial advice of Johnson and others on his private wealth management team who convinced him to continue to pay exorbitant interest on the LOC instead of paying off the LOC following the liquidation of the trust account.

85. Defendants' willful misconduct forced Mr. Alexander to avert financial insolvency by depleting his retirement funds and underselling his personal property and real estate, to include the Broad Street Building.

21

86.     Mr. Alexander independently found a buyer to purchase the Broad Street Building on June 3, 2009 for $1.2 million to avoid the foreclosure proceedings that had been initiated by Consolidated.  Mr. Alexander recouped nominal or no profit from the sale of the Broad Street Building after paying off the outstanding mortgage loan and Consolidated's foreclosure costs.

87.     Meanwhile, Mr. Alexander offered to enter into a payment plan with Bank of America which he would secure by encumbering three properties that he managed to maintain ownership of through his financial distress.  Despite Mr. Alexander's repayment proposal, Bank of America filed a lawsuit and ultimately obtained default judgment against Mr. Alexander and his businesses on October 2, 2009 in the amount of $84,049.30 in compensatory damages; $11,462.23 in contractual interest; $13,231.56 in attorneys' fees; and $386.67 in court costs.

88.     To date, this judgment has not been satisfied.

### COUNT I – PROFESSIONAL MALPRACTICE

89.     Plaintiffs restate and incorporate herein the allegations set forth above in paragraphs 1 through 88.

90.     A fiduciary relationship existed between Mr. Alexander and the persons assigned by Bank of America to render Mr. Alexander private wealth management services to include, without limitation, defendants Mobley and Johnson, who acted at all times relevant to this dispute as agents and/or employees of Bank of America functioning within the scope of their employment related duties.

91.     Mr. Alexander executed the Services Agreements and further agreed to pay Bank of America $1,000 per month to manage the Broad Street Building because Bank of America led him to believe that Johnson, Mobley and its other private wealth management professionals would exercise the knowledge, skill and care ordinarily employed by registered investment

advisors, wealth management strategists, property managers and other similarly situated professionals in the financial services field by:

(1) becoming intimately familiar with his specific financial needs and objectives and providing him with sound professional advice concerning the maintenance and allocation of his financial resources;

(2) providing him with guidance as to how to effectively manage his various business ventures, to include the management and disposition of his real estate holdings;

(3) insuring that he receive funding through personal and commercial loans to adequately manage and maintain his various assets and businesses; and

(4) assisting him with fulfilling his primary objective of developing and maintaining a reliable source of income following his retirement from professional basketball.

92.    In lieu of upholding these minimal professional standards as promised, Defendants deviated from their fiduciary and contractual obligations and the applicable care standard in that they purposefully failed to disclose material information, provided grossly substandard services and advice and engaged in a pattern of self dealing to advance their own pecuniary interests at Mr. Alexander's expense.

**Violation of Disclosure Obligations**

93.    In accordance with applicable professional standards, Defendants, as Mr. Alexander's fiduciaries, were obligated to disclose all things within their knowledge that may have affected Mr. Alexander's decisions with respect to the management and allocation of his financial resources and real estate holdings.

94.    The Bank and Johnson violated the duties owed Mr. Alexander by failing to fully disclose their concerns regarding the fulfillment of Mr. Alexander's request for refinancing with respect to his Goochland home.

95.    Johnson and the Bank's other wealth management professionals led Mr. Alexander to believe that refinancing his Goochland home would help stabilize his financial situation following his retirement from professional basketball.

96.    Johnson and the Bank's other wealth management professionals further led Mr. Alexander to believe that for him to qualify for refinancing he would have to keep adequate cash reserves in the Bank in order to fulfill the Bank's collateralization requirements for a refinance mortgage loan.

97.    Consequently, Mr. Alexander kept the funds in his trust account in lieu of liquidating the trust account and selling the securities Mr. Alexander owned to pay off the balance of the LOC and stem the imposition of further interest charges and overdraft fees.

98.    By Johnson and its other wealth management professionals deterring Mr. Alexander from paying off the LOC, Bank of America was able to generate additional income from the interest earned from the LOC and the reinvestment of the funds on reserve in Mr. Alexander's trust account.

99.    Meanwhile, Johnson and the other members of Mr. Alexander's wealth management team purposefully concealed their knowledge of the Bank's inclination to decline Mr. Alexander's application for a refinanced mortgage notwithstanding Mr. Alexander's compliance with their request to keep funds on reserve in his trust account.

100.    Had Mr. Alexander been made aware of the Bank's inclination to deny his loan application, he would have liquidated his trust account to pay off the LOC and refrained from

investing any further money to enhance the value of his Goochland home for purposes of the proposed refinance.

101.    Due to Johnson's and the Bank's other wealth management professionals' failure to make the requisite disclosures in comport with applicable industry standards, Mr. Alexander left the LOC open, resulting in the imposition of further interest charges and overdraft fees which ultimately led Bank of America to pursue and obtain a money judgment against Mr. Alexander and his various businesses for outstanding fees and charges that remained in tact after the LOC was finally paid off. Moreover, the Bank's denial of Mr. Alexander's request for refinancing left Mr. Alexander on the brink of insolvency, cash poor and unable to address mounting debt obligations.

102.    Mobley and Bank of America violated their disclosure obligations to Mr. Alexander by failing to apprise him of facts indicative of WAWA's heightened commitment to acquiring the Broad Street Building upon completion of its due diligence.

103.    Neither Mobley nor any other member of Mr. Alexander's wealth management team informed Mr. Alexander of WAWA's willingness to pay a non-refundable deposit as a condition for the purchase of the building; these defendants knew or should have known said willingness to pay a non-refundable deposit was highly indicative of WAWA's desire to effectuate the proposed sale transaction.

104.    On information and belief, Mr. Mobley was aware that WAWA had completed a crime survey prior to issuing its letter of intent, yet he failed to disclose this fact to Mr. Alexander nor the significance of WAWA conducting this preliminary due diligence as an additional indicator of WAWA's keen interest in acquiring the Broad Street Building.

105.    Mobley failed to adequately apprise Mr. Alexander of WAWA's interest in acquiring the Broad Street Building, and as a direct result, Mr. Alexander did not know how vitally important it was to negotiate an option agreement with WAWA for the acquisition of the property.

106.    By failing to negotiate a sale contract with WAWA, Mr. Alexander lost an excellent opportunity to achieve his stated goal of selling the Broad Street Building to a corporate entity for a sizeable profit. Instead, Mr. Alexander ended up selling the property roughly eighteen (18) months after Mobley's receipt of WAWA's letter of intent well below market value in a distressed sale that occurred during a depressed economic climate to stem foreclosure proceedings initiated by Consolidated.

107.    Instead of making in excess of $1,000,000 profit from the sale of the Broad Street Building, Mr. Alexander barely made enough money from the sale of the property to pay off the balance of the mortgage loan and the lender's foreclosure costs.

### Failure to Render Competent Professional Services and Advice

108.    From the outset, Defendants were fully apprised of Mr. Alexander's long term financial goals and objectives. Mr. Alexander told the members of his wealth management team that his primary objective was to establish a sustainable source of income following his retirement from professional basketball.

109.    Johnson, Mobley and other members of Mr. Alexander's wealth management team knew that Mr. Alexander wished to obtain his stated financial goals through the establishment of a lucrative real estate portfolio. Johnson, Mobley and the other wealth management team members knew that to develop this portfolio Mr. Alexander would have to effectuate the sale of the Broad Street Building for a sizeable profit.

26

110.   Johnson, Mobley and other wealth management team members also knew that Mr. Alexander created his businesses, CARRSS and Motorsports, to fulfill two short-term objectives. The businesses were formed, in part, to provide Mr. Alexander's father with a steady source of employment income as he was tasked with the day-to-day management of the businesses. The businesses were also formed to create a tax shelter for Mr. Alexander as he used the losses incurred in the operation of the businesses to offset his professional basketball earnings.

111.   Despite their knowledge of the foregoing facts, Johnson, Mobley and the other members of Mr. Alexander's wealth management team willfully failed to provide financial advice and property management services to address Mr. Alexander's cash flow problems following the expiration of his professional basketball career as required by the applicable professional care standards. This change in Mr. Alexander's circumstances warranted a change in their proposed strategy and decision-making.

112.   When Mr. Alexander's financial situation materially changed following his retirement from professional basketball, neither Johnson, Mobley nor any other member of the Bank's wealth management team advised Mr. Alexander how to eliminate debt and debt-service obligations and free up capital needed to cover expenditures and implement a different investment strategy.

113.   In lieu of advocating prudent cost containment strategies and advising Mr. Alexander to liquidate his securities to pay off existing debt obligations, Johnson and the Bank's other wealth management professionals led Mr. Alexander to believe that he could stabilize his financial situation through the refinancing of his Goochland home.

27

114. Johnson and the Bank's other wealth management professionals led Mr. Alexander to believe that he would be approved to refinance his Goochland home through Bank of America. Consequently, on Johnson's advice, Mr. Alexander kept over $2 million in unliquidated securities in his trust account at Bank of America in lieu of selling these securities to pay off the LOC. Moreover, Mr. Alexander, at the suggestion of Johnson and/or his other wealth management strategists, used monies he had available to enhance the value of the Goochland home instead of using these funds to pay off the LOC and other debt obligations.

115. Johnson and Bank of America purposefully provided Mr. Alexander with errant advice regarding the benefits of the proposed refinancing in a misguided effort to turn him into a perpetual borrower beholden to the Bank for an indeterminate amount of time.

116. Likewise, while Mobley and Bank of America recognized that the sale of the Broad Street Building was critical to improving Mr. Alexander's financial situation, these defendants willfully provided errant advice to frustrate Mr. Alexander's ability to dispose of the property and maximize its sale price, effectively extending the Bank's lucrative property management services contract.

117. Mobley and the Bank knew that WAWA's offer to pay a non-refundable deposit as a condition to secure an option to purchase the Broad Street Building was indicative of the company's heightened desire to close on the acquisition of the property following the completion of its due diligence. Moreover, Mobley and the Bank knew that WAWA's commission of a crime survey prior to initiating negotiations for the acquisition of the Broad Street Building was yet another indication of WAWA's high level of interest in the property.

118. With this knowledge Mobley and the Bank should have complied with the relevant standard of care, which standard of care will be established at trial via expert opinion

28

testimony, and at the very least responded to WAWA's initial letter of intent with a modest counteroffer.  Instead, Mobley and the Bank never responded to WAWA's offer and further deterred Mr. Alexander from looking into matters further by convincing him that it would not be feasible to agree to WAWA's proposed terms.  Mobley and the Bank failed to comply with the relevant standard of care in this regard and purposely refused to pursue WAWA's offer, desiring to maintain their lucrative property management services agreement.

119.    As a direct and proximate result of the substandard services and advice provided by Johnson, Mobley and the other members of the Bank's private wealth management team, Mr. Alexander incurred significant losses vis-à-vis his investment of time and monetary resources purportedly needed to facilitate a refinance mortgage loan that ultimately never came to fruition and in the form of lost revenues stemming from the failure to sell the Broad Street Building to WAWA during the height of the real estate market back in 2006.

### Failure to Act in Good Faith and Refrain from Self-Dealing

120.    Defendants had a duty to act in good faith consistent with their fiduciary duties to pursue Mr. Alexander's best interests, pecuniary and otherwise.

121.    Defendants violated their obligation to act in good faith and deal fairly with Mr. Alexander when they purposefully failed to disclose information critical to Mr. Alexander's decisions concerning the allocation of his financial resources in order to advance their own pecuniary interests (self-dealing).

122.    Defendants coveted Mr. Alexander as a bank client at the time he was still earning a lucrative salary as a professional basketball player and, in fact, the Bank tried to leverage its relationship with him to lure other professional athlete clients.

123.   The Bank was preoccupied from the outset with taking advantage of Mr. Alexander's value as a high net worth client with lending needs and large sums of cash on deposit.   After Mr. Alexander's circumstances materially changed following his basketball career, Defendants acted in furtherance of their own pecuniary interests (self-dealing) to Mr. Alexander's detriment, proximately causing Mr. Alexander to suffer damages.

124.   Johnson and other members of Mr. Alexander's wealth management team provided deliberately errant advice in response to Mr. Alexander's repeated inquiries regarding the LOC.   In lieu of paying off the LOC as he would have liked, Mr. Alexander kept cash on reserve in the Bank on Johnson's advice that it was needed to facilitate a refinancing of his Goochland home.   This refinancing arrangement never came to fruition despite Mr. Alexander having over $700,000 in equity in the home and an unencumbered piece of property adjacent to the home which could have served as collateral for the loan.

125.   The Bank's self-serving conduct through Johnson and its other wealth management professionals violated the standard of care, the fiduciary duties owed Mr. Alexander and the Bank's implied duty to carry-out its contractual obligations in good-faith, proximately causing Mr. Alexander to incur exorbitant interest charges and overdraft fees with no prospect of refinancing to resolve his mounting debt obligations.

## COUNT II – BREACH OF CONTRACT

126.   Plaintiff reasserts and incorporates herein the allegations set forth in paragraphs 1 through 125 above.

127.   Mr. Alexander paid Bank of America $1,000 per month to manage the Broad Street Building.  Bank of America represented to Mr. Alexander, in writing, that Mobley would

perform a myriad of services with respect to the Broad Street Building to include, "[e]stablishing sales prices, negotiating contracts, [and] responding to offers."

128.   Bank of America breached this contractual obligation when Mobley failed to respond to WAWA's letter of intent regarding the purchase of the Broad Street Building.

129.   Mobley's failure to respond to WAWA's letter of intent and initiate negotiations for the sale of the Broad Street Building was grossly negligent and cost Mr. Alexander the opportunity to sell this property for a sizeable profit during the height of the real estate market back in 2006 as opposed to having to enter into a distressed sale to avoid foreclosure.

130.   Mr. Alexander sold the Broad Street Building on his own to avoid foreclosure. Mr. Alexander realized no profit from this distressed sale that occurred during the midst of a depressed real estate market.

131.   Mr. Alexander continued to pay Bank of America the negotiated management fee despite arranging for the sale of the Broad Street Building on his own. That notwithstanding, Bank of America audaciously and erroneously posits that it is also should receive a commission from the sale of the property.

132.   To date, Mr. Alexander has paid Bank of America in excess of $70,000 in property management fees. Mr. Alexander did not reap the benefits of this bargain as Mr. Mobley failed to meet his contractual obligations with respect to the marketing and sale of the Broad Street Building.

## PRAYER FOR RELIEF

WHEREFORE this Court is compelled to enter an Order rewarding Plaintiffs compensatory damages in the amount of $15,000,000, attorney's fees, prejudgment interest, and

punitive damages against each defendant in the amount of $350,000 and for any such other relief as this Court deems just.

Respectfully submitted,

**CORY ALEXANDER,**
**ALEXANDER ENTERPRISES #1 LLC**
**THE ALEXANDER FAMILY REVOCABLE**
**TRUST**


By: _____
                    Counsel

Godfrey T. Pinn, Jr.
Harrell & Chambliss LLP
Eighth & Main Building
707 East Main Street, Suite 1000
Richmond, Virginia 23219
(804) 915-3220
(804) 915-3240 (fax)
gpinn@hclawfirm.com

D. Hayden Fisher, Esquire
D. Hayden Fisher, Esquire, PLC
P.O. Box 7321
Richmond, Virginia 23221
(804) 340-0285
(804) 282-2725 (facsimile)
haydenfisher@mac.com

# COMMONWEALTH OF VIRGINIA



### RICHMOND CITY CIRCUIT COURT
Civil Division
400 NORTH 9TH STREET
RICHMOND  VA  23219-1540
(804) 646-6506

Proof of Service

Virginia:
In the RICHMOND CITY CIRCUIT COURT

Case number: 760CL10002529-00
Service number: 001
Service filed: June 01, 2010
Judge: TJM

Served by: SPECIAL PROCESS SERVER
Style of case: ALEXANDER, CORY vs BANK OF AMERICA NA
Service on: BANK OF AMERICA N/A
SVE: CT CORPORATION SYS
REGISTERED AGENT
4701 COX ROAD
SUITE 301
GLEN ALLEN VA 23060

Attorney: PINN, GODFREY T; JR
(804) 643-8401

RECEIVED AND FILED
CIRCUIT COURT

MAR 1 7 2011

BEVILL M DEAN, CLERK
BY _____ D.C.

Instructions:

Returns shall be made hereon, showing service of Summons issued Friday, March 11, 2011 with a copy of the
Amended Complaint filed Tuesday, June 01, 2010 attached.

Hearing date  :
Service issued: Friday, March 11, 2011

For Sheriff Use Only

*Hester*

## Service Authorization

CT Corporation System is registered agent for various corporations, limited liability companies and partnerships. The following persons are designated in the office of the corporation upon whom any process, notice or demand may be served as representatives of the Corporation.

Tinika C. Baylor

Katie E. Bush

Adam Carr

Jenn Greene

Dacia Jamison

This authorization pertains to the authority of individuals to receive process on behalf of CT Corporation System and Business Filings Incorporated. It does not certify the receipt or acceptance of any specific process.

Tinika C. Baylor
Corporate Operations Manager
CT Corporation System
A Wolters Kluwer Company

State of Virginia
County of Henrico

This day personally appeared before me, Tinika C. Baylor, whose name is signed above and who, being first duly sworn, upon her oath, states that the foregoing Affidavit is true to the best of her knowledge and belief.

Subscribed and sworn before me this 10th day of March, 2010

Notary Public

# AFFIDAVIT OF SERVICE
## Commonwealth of Virginia
## City of Richmond Circuit Court

Cory Alexander, et al.                ) Case No.: CL10002529-00
                                               )

                        **Plaintiff**      )
                           **v.**           )
Bank of America, N.A., et al.            )
                                             )
                       **Defendant**    )

I, Christopher S. Hester, a Private Process Server, being duly sworn state that I am over the age of eighteen years, not a party to the above-named action, nor otherwise interested in the subject matter in controversy. Within the boundaries of the state where service was effected, I was authorized by law to perform said service.

I served the following document(s): Summons and Amended Complaint

Service on: Bank of America, N.A., c/o CT Corporation System, R/A
Service address: 4701 Cox Road, Suite 301, Glen Allen, VA 23060.

Date of service: March 15, 2011   Time of service: 3:15 PM

MANNER OF SERVICE:
(XX) PERSONAL SERVICE–accepted by Dacia Jamison, Found in Charge

COMMENTS:


_____

Christopher S. Hester
Hester Process Service, Inc.
P.O. Box 37128
Richmond, VA 23234
(804) 271-0298


Subscribed and sworn to before me, a notary public, on this 16th day of March, 2011 by Christopher S. Hester who is personally known to me.

_____   My Commission Expires: 11-30-12
Notary Public
Donna Faye Hester
Commonwealth of Virginia
County of Chesterfield



ID: 11-025603   Client Reference: ALEXCORY.100159-56

## HARRELL & CHAMBLISS LLP
### ATTORNEYS AT LAW

EIGHTH & MAIN BUILDING
SUITE 1000
707 EAST MAIN STREET
**RICHMOND, VIRGINIA 23219**

MAILING ADDRESS:
POST OFFICE BOX 518
RICHMOND, VA 23218-0518

TELEPHONE (804) 643-8401
FACSIMILE (804) 648-2707
WWW.HCLAWFIRM.COM

February 15, 2011

*CL10-2529*

The Honorable Bevill M. Dean, Clerk
Richmond City Circuit Court
John Marshall Courts Building
400 North 9th Street
Richmond, Virginia 23219

Re:     Cory Alexander, et al v. Bank of America, N.A.

Dear Mr. Dean:

Please find enclosed for filing a Motion for Leave to File Amended Complaint in the above referenced matter. We are requesting that defense counsel execute an agreed Order for the filing of the Amended Complaint to ameliorate the need for a hearing on the enclosed motion. However, if opposing counsel objects to this filing, we will be in touch shortly to schedule a hearing on this matter.

As always, we thank you for your cooperation and assistance. Should you have any questions, please do not hesitate to contact me at (804) 915-3251.

Sincerely,

Godfrey T. Pinn, Jr.

Enclosure

RECEIVED & FILED
CIRCUIT COURT
9:35
FEB 15 2010
BEVILL M. DEAN, CLERK
BY_____D.C.

VIRGINIA:

## IN THE CIRCUIT COURT OF THE CITY OF RICHMOND
### John Marshall Courts Building

CORY ALEXANDER,

ALEXANDER ENTERPRISES #1, LLC

THE ALEXANDER FAMILY REVOCABLE TRUST

Plaintiffs,

v.                                  Case No. CL10-2529 - 3

BANK OF AMERICA, N.A.,

RENEE JOHNSON,

and

BYRON MOBLEY,

Defendants.

## ORDER

Plaintiffs, by counsel, hereby represent that no service has been requested or effectuated upon the defendant(s) in this matter, and no counsel of record has made an appearance on behalf of the defendant(s). Accordingly, Plaintiffs shall be granted leave to file their Amended Complaint pursuant to Rules 1:8 and 3:16.

It is so ORDERED.

Enter: _3 /2 /11_

_____
Judge

1

We ask for this:


Godfrey T. Pinn, Jr.
SB No. 43106
Harrell & Chambliss LLP
Eighth & Main Building
707 East Main Street, Suite 1000
Richmond, Virginia 23219
(804) 915-3220
(804) 915-3240 (fax)
gpinn@hclawfirm.com

D. Hayden Fisher, Esquire
D. Hayden Fisher, Esquire, PLC
P.O. Box 7321
Richmond, Virginia 23221
(804) 340-0285
(804) 282-2725 (facsimile)
haydenfisher@mac.com

*Counsel for Plaintiffs*

**VIRGINIA:**

**IN THE CIRCUIT COURT OF THE CITY OF RICHMOND**
**John Marshall Courts Building**

**CORY ALEXANDER,**

**ALEXANDER ENTERPRISES #1, LLC**

**THE ALEXANDER FAMILY REVOCABLE TRUST**

                                                              Plaintiffs,

**v.**                                        Case No.  CL10-2529

**BANK OF AMERICA, N.A.,**

**RENEE JOHNSON,**

**and**

**BYRON MOBLEY,**                                        Defendants.

<u>**MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**</u>

Plaintiffs, by counsel, move for the entry of an Order granting them leave to file their Amended Complaint in the above-styled cause of action, a copy of which is attached hereto. Plaintiffs represent that the defendants named in the Amended Complaint will not be unduly prejudiced by its filing, as the original Complaint has yet to be served, no trial date has been set in this matter, no pretrial order entered, and no discovery conducted thus far.

**WHEREFORE** the Court is compelled to grant this motion pursuant to Rule 1:9 of the Rules of Supreme Court of Virginia along with any such other and further relief as the Court deems just and appropriate.

RECEIVED & FILED
CIRCUIT COURT
FEB 15 2010
BEVILL M. DEAN, CLERK
BY_____ D.C.

1

Respectfully submitted,

**CORY ALEXANDER,**
**ALEXANDER ENTERPRISES #1 LLC**
**THE ALEXANDER FAMILY REVOCABLE**
**TRUST**


By: _____
                        Counsel

Godfrey T. Pinn, Jr.
Harrell & Chambliss LLP
Eighth & Main Building
707 East Main Street, Suite 1000
Richmond, Virginia 23219
(804) 915-3220
(804) 915-3240 (fax)
gpinn@hclawfirm.com

D. Hayden Fisher, Esquire
D. Hayden Fisher, Esquire, PLC
P.O. Box 7321
Richmond, Virginia 23221
(804) 340-0285
(804) 282-2725 (facsimile)
haydenfisher@mac.com

VIRGINIA:

## IN THE CIRCUIT COURT OF THE CITY OF RICHMOND
### John Marshall Courts Building

CORY ALEXANDER,

ALEXANDER ENTERPRISES #1, LLC

THE ALEXANDER FAMILY REVOCABLE TRUST

                                                          Plaintiffs,

v.                                      Case No.  CL10-2529

BANK OF AMERICA, N.A.,
          SERVE:        CT Corporation System
                        4701 Cox Road, Suite 301
                        Glen Allen, Virginia  23060-6802

RENEE JOHNSON,
          SERVE:

and

BYRON MOBLEY,                                        Defendants.

          SERVE:

### AMENDED COMPLAINT

Plaintiffs, Cory Alexander ("Mr. Alexander"), Alexander Enterprises #1, LLC ("Alexander Enterprises") and the Alexander Family Revocable Trust (the "Trust"), by counsel, aver the following for their Complaint in the above-styled case.

1

## INTRODUCTION

Mr. Alexander was a client of U.S. Trust, Bank of America Private Wealth Management ("Bank of America" or "Bank")[1] from approximately July 2003 until October 2009.[2]  At the beginning of his relationship with Bank of America, Mr. Alexander was financially stable and a multi-millionaire.  Mr. Alexander retained Bank of America to provide him with competent advice and assistance with handling his business and financial affairs.

However, instead of growing and securing Mr. Alexander's financial portfolio as promised, Bank of America became increasingly concerned with advancing its own pecuniary interests over the course of its relationship with Mr. Alexander which led the Bank to engage in a course of self-dealing which manifest itself in the promotion and ultimately the implementation of grossly negligent wealth management decisions by Mr. Alexander's private wealth management team which included defendants Byron Mobley ("Mobley") and Renee Johnson ("Johnson").  Defendants' willful and grossly negligent misconduct was in complete derogation of the contractual and common law fiduciary duties they owed Mr. Alexander.  Defendants' actions were also in violation of the standards applicable to professionals and financial institutions providing the type of private wealth management services that were purportedly being rendered to Mr. Alexander at all times relevant to this lawsuit.

## FACTS

1.      Mr. Alexander became a customer of Bank of America in July 2003 after leaving Wachovia/First Union ("Wachovia").  Mr. Alexander's prior exclusive banking relationship with

---

[1] Upon information and belief, U.S. Trust, Bank of America Private Wealth Management operates through Bank of America, N.A. and other subsidiaries of Bank of America Corporation.

[2] As alluded to below, Mr. Alexander entered into two service agreements with the Bank on behalf of Alexander Enterprises and the Trust; accordingly, these two entities are also plaintiffs herein.  Mr. Alexander acted on behalf of these entities at all times relevant.

Wachovia began soon after he signed a $13 million contract to play professional basketball with the National Basketball Association ("NBA") in January 1999.

2.      Mr. Alexander ultimately became dissatisfied with Wachovia due to what he believed to be the Bank's failure to assist him develop a long term wealth management and investment strategy that would generate sustainable wealth beyond the conclusion of his NBA career.

3.      Although reputable financial institutions such as SunTrust, BB&T, and First Market Bank actively recruited Mr. Alexander, he decided to establish a banking relationship with Bank of America based upon its representations and assurances regarding the superior abilities of its wealth strategists, who the Bank promised would be dedicated to assisting Mr. Alexander with the development of his financial and related business interests.  To facilitate these noble endeavors, the Bank assured Mr. Alexander that he would be receiving a heightened level of personal service and attention from the members of his wealth management team which was to be headed by Leslie Doyle ("Ms. Doyle"), who was assigned as Mr. Alexander's Private Client/Wealth Manager.  Bank of America owed Plaintiffs a fiduciary duty at all times relevant.

4.      At the outset of his relationship with Bank of America, Mr. Alexander's assets totaled approximately $7.5 million.  Mr. Alexander's individual net worth made him an attractive client to Bank of America who, at that time, was attempting to expand its clientele to include professional athletes.

5.      Bank of America believed Mr. Alexander "[represented] a great referral opportunity for other professional athletes." Consequently, in an effort to secure Mr. Alexander's business and thereby increase the Bank's potential pipeline of high net worth athlete clients, Ms. Doyle and others entrusted with the responsibility of recruiting Mr. Alexander made errant

30.     Mr. Alexander and his wife separated shortly after Mr. Alexander purchased his home and Bank of America extended the HELOC.

31.     Meanwhile, in the fall of 2004, Ms. Doyle was promoted within Bank of America which required her to relocate to the Bank's office in Norfolk, Virginia.  After Ms. Doyle's departure, Mr. Alexander informed the Bank that he was considering moving his business to another banking institution as he was growing disappointed with the overall quality of Bank of America's wealth management services.

32.     Bank of America grew concerned about Mr. Alexander's professed disappointment with its services upon hearing of his impending return to the NBA for the 2004-2005 Season.  Consequently, Bank of America persuaded Mr. Alexander to remain a customer by agreeing to allow Ms. Doyle to remain his private client manager, although she was physically located in the Bank's Norfolk office.  That said, while Mr. Alexander's Trust Officer remained the same, his portfolio manager was constantly changing and his relationship with his wealth strategist was virtually non-existent.

33.     Soon after convincing Mr. Alexander to stay on board, Ms. Doyle was promoted internally, yet again.  Consequently, the oversight and management of Mr. Alexander's account was reassigned to Renee Johnson ("Ms. Johnson") who was also physically located in Bank of America's Norfolk office.  Following the departure of Ms. Doyle, the quality of service and individualized attention to Mr. Alexander's account rapidly declined.

34.     The decline of Bank of America's overall level of service also, not so coincidentally, coincided with the decline of Mr. Alexander's income.  By October 2005, Mr. Alexander was no longer playing professional basketball, and Mr. Alexander's wealth management team was fully aware that he no longer had a steady source of income.   In light of

representations and omitted critical facts with respect to the breadth and overall benefits of the Bank's private wealth management services that they knew or should have known to be false and/or misleading at the time.

6. Bank of America aggressively recruited Mr. Alexander and ultimately secured his business by assuring him that its private wealth management professionals would:

- become intimately familiar with his specific financial needs and objectives, and would provide him with competent professional advice concerning his financial resources;

- guide and support his efforts to manage his various businesses efficiently and effectively, which included Cory Alexander Rims Racing Sound and Security ("CARRSS"), Cory Alexander Motorsports ("Motorsports"), Alexander Holdings, LLC ("Alexander Holdings"), and Alexander Enterprises 1-4;

- ensure that he obtained personal and commercial loans from Bank of America to properly manage and maintain his assets and businesses; and

- assist him in developing and maintaining a reliable source of income following his retirement from professional basketball.

7. In reliance upon these representations and assurances with respect to Bank of America's overall commitment to preserving and enhancing his financial assets, Mr. Alexander executed a Private Bank Investment Services Agreement on or about July 24, 2003 on behalf of the Trust, entrusting Bank of America to provide the financial management services promised therein among others.

8. Meanwhile, Bank of America representatives were steadily assessing Mr. Alexander's value as a private wealth management client, remarking how the Bank would benefit from Mr. Alexander's need for business and personal loans as well as from the extensive

amount of cash that Mr. Alexander would have on deposit in his personal and corporate checking accounts.

9.      Accordingly, shortly after securing Mr. Alexander's business, Bank of America extended Mr. Alexander a $1.5 million line of credit ("LOC") to pay off his existing line of credit with Wachovia and to provide him with capital to expand his business ventures, which, as alluded to above, included a number of automotive and real estate businesses.

10.     On or about November 5, 2003, Mr. Alexander executed a promissory note to extend the existing LOC from $1.5 million to $2 million (the "Promissory Note"), which was secured by the securities in Mr. Alexander's trust account (the "Trust") which were valued at over $3 million at that time.

11.     Under the terms of the Promissory Note, Mr. Alexander was required to make interest-only payments each month at the rate of 2.1% - 3.4%, which amounted to approximately $3,400 per month, until the maturity date of the loan on November 14, 2004.  On the date of maturity, Mr. Alexander was required to pay off the principal balance and any remaining accrued interest.  Although Mr. Alexander was only required to make monthly, interest-only payments on the LOC, he often made principal payments in an effort to keep the accrued interest at a minimum.

12.     The monthly LOC interest payments were automatically withdrawn from a Bank of America business checking account that was set up for Alexander Holdings, the entity which owned all of Mr. Alexander's various business enterprises.  The formation of Alexander Holdings allowed Mr. Alexander to combine all of his business income and losses and report them on his individual income tax returns.  The members of Mr. Alexander's wealth management team knew or should have known that Mr. Alexander implemented this reporting

5

strategy at the advice of his personal accountant and legal advisors so that he could offset any business losses that he incurred against his lucrative NBA earnings.

13.    On November 19, 2003, Mr. Alexander executed another Private Bank Investment Services Agreement with Bank of America on behalf of Alexander Enterprises giving Bank of America managerial responsibility over the business banking account for Alexander Holdings as well as a building that Mr. Alexander owned at 4300 West Broad Street in Richmond, Virginia (the "Broad Street Building").[3] Bank of America and Mr. Mobley served as the property management agents for the Broad Street Building at all times relevant.

14.    Alexander Enterprises owned the Broad Street Building.  Mr. Alexander formed Alexander Enterprises solely to hold title to the building while his two other automotive companies, CARRSS and Motorsports, operated there.

15.    Mr. Alexander agreed to pay Bank of America $1,000 per month in exchange for Bank of America's property management of the Broad Street Building.  In exchange for the $1,000 per month property management fee, Bank of America promised, in writing, that Mobley would provide services regarding the Broad Street Building and Mr. Alexander's other real estate assets.   Mobley's duties included "[e]stablishing sales prices, negotiating contracts, [and] responding to offers" related to the Broad Street Building.  Concomitant therewith, Mobley had a fiduciary, contractual and professional duty to share all purchase offers or inquiries regarding the Broad Street building with Alexander.

16.    In reliance upon these express promises, Mr. Alexander paid Bank of America in excess of $70,000 in property management fees over the course of the parties' relationship.

---

[3] The Private Bank Investment Services Agreements executed on July 24 and November 19, 2003 shall be collectively referred to hereinafter as the "Service Agreements".

17.   While managing the Broad Street Building, Bank of America set monthly rents for CARRSS and Motorsports that were automatically drafted from separate business banking accounts specifically established for these two enterprises.

18.   Prior to purchasing the Broad Street Building, Mr. Alexander entered into an arrangement to lease a portion of the property to Budget Rental Car ("Budget"). Accordingly, as part of its managerial responsibilities, Bank of America also agreed to collect rent from Budget and service Budget's tenant needs.

19.   From the outset of his relationship with Bank of America, Mr. Alexander continuously expressed his position that the profitable operation of CARRSS and Motorsports was only tangential to his overall long term investment strategy.

20.   Mr. Alexander repeatedly advised Mobley and the other members of his wealth management team that his primary focus was Alexander Enterprises, his real estate investment company, which he believed had the greatest earning potential based on what he paid for the Broad Street Building in 2001. Mr. Alexander anticipated realizing a significant profit when he sold the Broad Street building.

21.   Mr. Alexander repeatedly shared with Mobley and the other members of his wealth management team his envisioned "best case scenario" of selling the Broad Street Building to a large corporation for a considerable profit. Mr. Alexander directed Mobley to market the Broad Street Building to such potential buyers.

22.   Mobley and the other members of Mr. Alexander's wealth management team were fully apprised of Mr. Alexander's desire to develop a lucrative real estate portfolio, an endeavor that all involved knew or should have known was contingent upon the profitable disposition of the Broad Street Building.

23.    From the outset, Mr. Alexander advised Mobley and the other members of his wealth management team that CARRSS and Motorsports were primarily created to provide Mr. Alexander's father, who managed the businesses, with a meaningful employment opportunity and a steady source of income.    Defendants knew Mr. Alexander intended for the businesses to shelter his NBA income from taxes to the extent the businesses operated at a net loss.

24.    Although Mr. Alexander believed that there was a possibility of franchising CARRSS and Motorsports at some point in the foreseeable future, he made it absolutely clear to Defendants that he did not wish to stake his financial future on the profitability of these businesses.    Rather, he intended for the businesses to improve the Broad Street Building, enhance its value and attract other potential buyers or tenants while providing a job for his father and tax shelter for his NBA income.

25.    Mr. Alexander's primary focus in 2003 was the real estate that he owned, which was evident by the fact that he listed the Broad Street Building that year for a brief period of time to test the market.    At all times relevant, he directed Mobley to market the Broad Street property to potential corporate buyers.

26.    By housing CARRSS and Motorsports in the Broad Street Building, Mr. Alexander intended to occupy and enhance the value of the property through the creation of positive cash flow from rental income and aesthetic improvements.    Mr. Alexander believed these owner-occupier enhancements would attract prospective buyers and businesses to invest in or locate to other properties in the immediate vicinity.    Nevertheless, Mr. Alexander repeatedly advised Mobley he would be willing to relocate CARRSS and Motorsports to a smaller, less costly location if necessary to facilitate the profitable sale of the Broad Street Building.

Case 3:11-cv-00220-JAG   Document 1-1   Filed 04/07/11   Page 51 of 68 PageID# 63

27.     In the summer of 2004, Mr. Alexander sold two homes that he owned in the Richmond area to provide him with the funds needed to build a new home for his family on a vacant lot that he had previously purchased in 1999 in the Rivergate subdivision of Goochland County.

28.     However, by this time Mr. Alexander had been out of the NBA for about three years and the salary he was receiving from his contract buyout was coming to an end. Accordingly, Bank of America was not willing to lend Mr. Alexander the money needed to build his home forcing Mr. Alexander to explore other financial options. Mr. Alexander eventually sold the lot he had purchased in the Rivergate subdivision for a net profit of approximately $500,000 which he applied to the purchase of a house in Goochland County in July 2005.

29.     The house Mr. Alexander purchased needed renovations to make it habitable, so in September 2005, Bank of America extended Mr. Alexander and his wife a home equity line of credit ("HELOC") in the amount of $250,000 to fund the necessary renovations and purchase a one acre parcel of land adjacent to Mr. Alexander's home.

30.     Mr. Alexander and his wife separated shortly after Mr. Alexander purchased his home and Bank of America extended the HELOC.

31.     Meanwhile, in the fall of 2004, Ms. Doyle's promotion by Bank of America required her to relocate to the Bank's office in Norfolk, Virginia. After Ms. Doyle's departure, Mr. Alexander informed the Bank that he was considering moving his business to another banking institution due to his growing disappointment with his overall experience with the wealth management services Bank of America had provided.

32.     Bank of America did not acknowledge Mr. Alexander's professed disappointment with its services until learning of his impending return to the NBA for the 2004-2005 Season.

9

Thereafter, Bank of America persuaded Mr. Alexander to remain a customer by agreeing to allow Ms. Doyle to remain his private client manager, although she was physically located in the Bank's Norfolk office. That said, while Mr. Alexander's Trust Officer remained the same, his portfolio manager changed constantly and his relationship with his wealth strategist became non-existent.

33.     Soon after convincing Mr. Alexander to remain a customer, Ms. Doyle was promoted again and pulled off of Mr. Alexander's accounts. Bank of America reassigned its oversight and management of Mr. Alexander's portfolio to Johnson who also worked in Bank of America's Norfolk office. From this point forward, Johnson served as Mr. Alexander's private wealth manager. Following the departure of Ms. Doyle, the quality of service and individualized attention Mr. Alexander's portfolio received further diminished.

34.     The services Defendants provided to Mr. Alexander diminished even further when Mr. Alexander stopped playing professional basketball in October 2005. Defendants should have known the end of Mr. Alexander's professional basketball career would materially change his financial status as he would no longer be able to rely upon the significant income he derived playing basketball. Defendants failed to advise Mr. Alexander how he should adjust to these changed circumstances and, consequently, he withdrew cash from his trust account to support his businesses, general living expenses and cover the interest payments on the LOC, which at this time was completely exhausted. This material change in circumstances should have prompted Defendants as Mr. Alexander's registered investment advisor, wealth manager and property manager to advise Mr. Alexander to make changes to his wealth management strategy and realign his portfolio accordingly. As his registered investment advisor, wealth

management strategist and property manager, Defendants owed Mr. Alexander contractual, professional and fiduciary duties at all times relevant.

35.  Despite the exhaustion of the LOC, Defendants, as Mr. Alexander's wealth management strategist, property management advisor and registered investment advisor, willfully failed to advise Mr. Alexander to sell some or all of his securities and other assets to reduce or extinguish his debt service obligations.  As Mr. Alexander's registered investment advisor, property manager and wealth management strategist, the standard of care applicable to all professionals within these fields required Defendants to act prudently and put Mr. Alexander's interests above their own interests among other things.  Instead, Defendants put their interests above Plaintiffs' interests as evinced by, among other things, the Bank's repeated extensions of the maturity date on the Promissory Note tied to the LOC and continuous withdrawal of funds from the Alexander Holdings account to pay accruing interest (approximately $10,000 per month at this juncture) on the unpaid LOC balance.

36.  Meanwhile, Mr. Alexander continued to use available funds from the HELOC to complete the renovations to his home in Goochland.  Bank of America and Johnson led Mr. Alexander to believe the money he expended to renovate and enhance the value of his home would enable him to refinance the property and withdraw cash to use to payoff other loan obligations for which he had less favorable credit terms.  Bank of America and Johnson should have advised Mr. Alexander against this strategy in comport with their contractual and fiduciary duties and applicable professional standards.

37.  At this time, Bank of America sought to increase the significant interest income Mr. Alexander was paying on both the HELOC and LOC by extending Mr. Alexander more home equity credit by refinancing his mortgage once his home renovations were complete.

11

38.     As Mr. Alexander's registered investment advisor and wealth management strategist the Bank and Jonson were obliged by their contractual and fiduciary duties and the applicable standards of professional care to advise Mr. Alexander to pay off the balance of the LOC with the available cash from his securities account. These defendants willfully deviated from said standards and instead advanced their own interests vis-a-vis the Bank's extension of more credit to Mr. Alexander to pay the interest on the preexisting lines of credit the Bank had already extended him. Rather than satisfying their contractual, fiduciary and professional obligations, the Bank, Johnson and Mobley withheld prudent professional advice to render Mr. Alexander a valuable and lucrative perpetual borrower.

39.     Despite the uncertainty of Mr. Alexander's financial situation, Defendants failed to advise him of any plausible cost containment solutions or similar advice to preserve his financial resources. Rather, Defendants placed Mr. Alexander in the untenable position of having to borrow his way out of debt.

40.     In November 2005, Mr. Alexander's father, who was in charge of CARRSS' daily business operations, suffered a stroke and was unable to perform his managerial duties.

41.     Due to this unfortunate reality and material change in circumstances, Mr. Alexander was required to spend the majority of his time with his father at the hospital in a caretaker capacity. Meanwhile, CARRSS was losing money at a fairly significant rate as a result of Mr. Alexander's and his father's inability to manage the business.

42.     Due to these extenuating and material changes in circumstances and pursuant to Mr. Alexander's request, Bank of America listed the Broad Street Building for sale again in December 2005.

43.    On or about January 31, 2006, Bank of America received a non-binding letter of intent from WAWA, Inc. ("WAWA") to purchase the Broad Street Building.

44.    The letter of intent stated WAWA's interest in acquiring the property for $2,000,000 subject to certain qualifications and conditions which included WAWA's completion of its initial due diligence (i.e., title search, site plan and survey, environmental survey and analysis) prior to the execution of a purchase contract, which would have preceded WAWA's acquisition of the necessary zoning and permit approvals for the construction and use of a twenty-four (24) hour convenience store on the property.

45.    In its letter of intent, WAWA offered to pay a $3,000 non-refundable deposit to compensate Mr. Alexander for keeping the property off the market during the initial due diligence period. WAWA also offered additional monetary deposits to compensate for any additional amount of time that it may need to keep the property off of the market to complete its due diligence. These offers demonstrate WAWA's serious interest in purchasing the property for $2,000,000 and show that the sale was reasonably certain to occur because these contingencies would have been satisfied. For example, on information and belief, WAWA had already completed a crime survey as well as some other preliminary due diligence prior to sending the non-binding letter of intent to its regional broker for submission to Mobley and Bank of America.

46.    On information and belief, WAWA had a heightened interest in the location of the Broad Street Building and would have been amenable to agreeing to terms more favorable to Mr. Alexander to shore up its right to purchase the property had Mobley and the other members of Mr. Alexander's wealth management team at Bank of America been more diligent in their efforts to negotiate on Mr. Alexander's behalf.

13

47.    WAWA's willingness to pay a non-refundable deposit should have caused Mobley and the other pertinent members of Mr. Alexander's wealth management team to realize WAWA was interested in acquiring the Broad Street Building for $2,000,000 or more.

48.    Although Mobley made Mr. Alexander aware of the letter of intent, he did not adequately inform Mr. Alexander of the significance of the financial incentives WAWA offered to facilitate the completion of its requisite due diligence.

49.    The terms of the Services Agreement and the applicable professional standard of care obligated Mobley to respond to WAWA's offer.    Mr. Mobley failed to respond to WAWA's letter of intent in willful violation thereof.

50.    Mobley advised Mr. Alexander against WAWA's proposal on the misguided assumption WAWA would tie up the Broad Street Building for an excessive period of time without providing Mr. Alexander adequate assurance that the transaction would ultimately come to fruition.

51.    To truncate further negotiations with WAWA, Mobley falsely advised the listing broker for the Broad Street Building that the mortgage lender, Consolidated Bank & Trust Company ("Consolidated"), would not authorize Mr. Alexander to enter into a purchase contract with WAWA as it would take too long to close the sale transaction.    Mobley's willful misrepresentations in this regard were false, as no representative of Consolidated was ever notified of WAWA's letter of intent or interest in acquiring the Broad Street Building.

52.    Mobley's false assertions with respect to Consolidated's purported concerns about the WAWA proposal were devoid of merit because Mr. Alexander did not need authorization from Consolidated to sell the Broad Street Building for $2,000,000. Mr. Alexander's mortgage payments were current and his loan with Consolidated was in good standing. On information and

14

belief. Mobley falsely represented that Consolidated would not authorize the prospective sale to purposefully steer WAWA away from the deal and extend Mr. Alexander's property management arrangement with the Bank.

53.     Mobley's tortious acts and omissions with respect to the WAWA proposal were grossly negligent and in willful violation of the contractual obligations and professional standards that he and the Bank owed Mr. Alexander.

54.     Mobley's lack of diligence and affirmative misrepresentations regarding the WAWA offer is particularly disheartening considering that both he and the other members of Mr. Alexander's private wealth management team knew Mr. Alexander's long term financial stability following his retirement from professional basketball was contingent, in large part, upon his ability to sell the Broad Street Building to a lucrative buyer.

55.     Over the next eighteen (18) months, Mr. Alexander did not receive any viable offers for the purchase of the Broad Street Building.  Consequently, Mr. Alexander continued to utilize the money in his trust account to pay his living expenses, business-related expenditures and the costs to maintain the Broad Street Building.

56.     Mr. Alexander was also compelled to suspend any efforts to renovate his home in Goochland as he was going through a highly contested divorce and custody battle with his wife.

57.     The divorce proceedings placed a significant strain on Mr. Alexander's finances, and in order to maintain joint custody of his son, Mr. Alexander forfeited opportunities to play professional basketball overseas.  Defendants did not consider this change of circumstances when advising Mr. Alexander regarding his long-term financial situation in gross violation of their contractual and fiduciary obligations and applicable professional standards.

58.     Instead, on or about July 2007, Bank of America alerted Mr. Alexander that the funds in his trust account were dwindling and that as a result a margin call for the LOC would soon be approaching.

59.     Meanwhile, on August 3, 2007, Christine Thomas, a member of Mr. Alexander's wealth management team, sent Mr. Alexander's attorney an e-mail advising that Bank of America needed to "rearrange [Mr. Alexander's] financial picture" until Mr. Alexander could sell the Broad Street Building and stabilize his financial situation.

60.     To achieve this endeavor, Bank of America requested that Mr. Alexander's attorney prepare the necessary documents to allow Bank of America the authority to liquidate the dwindling assets in Mr. Alexander's trust account and transfer the funds into a money manager account to provide Mr. Alexander with immediate access to needed capital.

61.     In light of Bank of America's efforts to liquidate his trust account, Mr. Alexander sent an e-mail on August 7, 2007, to Johnson inquiring about the possibility of "paying [the LOC] down," which had been exhausted since October 2005.  In his e-mail, Mr. Alexander stated that "it really [didn't] make much [sense] for [him] to continue to hold on to a $2 [million] line of credit."  Mr. Alexander specifically inquired as to whether there would be any penalty for paying off the LOC as he "[did not] want to continue to pay over $10K [in interest] a month for money that [he could not] use."  Johnson did not reply to Mr. Alexander's e-mail inquiry in violation of her and the Bank's contractual and fiduciary obligations to Mr. Alexander and applicable professional standards.

62.     On August 17, 2007, Mr. Alexander and his accountant, Steve Piascik ("Mr. Piascik"), attended a meeting at Bank of America with representatives from both the Bank's Richmond and Norfolk branch offices including Ms. Doyle, Johnson and Mobley.  During the

meeting, Mr. Alexander discussed his divorce settlement as well as his plans for shoring up his financial situation which, at that point, required he sell the Broad Street Building or refinance his house in Goochland to obtain the cash necessary to meet his routine debt obligations. Moreover, Mr. Alexander deemed it imperative to eradicate the exorbitant monthly interest he was paying on the LOC.

63.    During the meeting, Mr. Alexander took the opportunity to ask Johnson in person about the question he raised in his August 7, 2007 email, concerning his ability to utilize the funds in his trust account to pay off the LOC. Johnson advised Mr. Alexander that the trust account funds would need to remain in tact so that Mr. Alexander showed adequate income and available cash reserves on hand to qualify to refinance his Goochland home. Mr. Alexander relied upon Ms. Johnson willful misrepresentations in this regard.

64.    Johnson's response led Mr. Alexander to believe that refinancing his home in Goochland would be the Bank's first objective in shoring up his financial situation. Bank of America's representatives at the meeting set a target date of November 15, 2007, to complete the steps necessary to refinance Mr. Alexander's Goochland home as Mr. Alexander had financial obligations stemming from his divorce settlement that needed to be resolved soon thereafter.

65.    Mr. Alexander advised his wealth management team that he needed cash to pay his divorce settlement and also needed to pay off the balance of the HELOC in the amount of $250,000 so that his ex-wife would no longer be jointly responsible for repayment of the loan. Accordingly, by e-mail dated August 24, 2007, Johnson assured Mr. Alexander that Bank of America "[would] try [its] best" to effectuate a home refinancing arrangement.

66.    Johnson then advised Mr. Alexander by e-mail dated August 27, 2007, that Bank of America would consider offering him a mortgage on his home at seventy percent (70%) loan

17

to value and gave Mr. Alexander the name of the contact person at the Bank to initiate the mortgage loan process.

67.     Mr. Alexander replied to Johnson by e-mail that same day advising that he was amenable to the proposed loan to value ratio. Mr. Alexander also advised that he had procured a copy of his credit report and felt compelled to resolve some outstanding debt obligations before initiating the mortgage loan process, unless Johnson felt that such action would not be necessary.

68.     Mr. Alexander also inquired as to when cash would be made available from the liquidation of his trust account so that he could "take care of the LOC and [other] outstanding issues."

69.     Johnson advised Mr. Alexander to pay his outstanding debts to facilitate the refinancing arrangement and further advised that cash from the trust account would be available before the end of that week.

70.     With the liquidation of his trust account in motion, Mr. Alexander felt compelled to inquire yet again about whether he could take the proceeds from the account and "apply the majority of it to the $2 [million] LOC to knock the balance down." Johnson replied that Bank of America had "decided that it made sense to put [Mr. Alexander's funds] in a CD and still keep [Mr. Alexander's] line of credit." This self-serving advice is indicative of Johnson's and the Bank's misguided efforts to place their interests ahead of Mr. Alexander's in gross violation of these defendants' contractual and fiduciary obligations and the professional standards applicable to those in the financial services industry.

71.     Johnson willfully misrepresented to Mr. Alexander that Bank of America consulted Mr. Piascik regarding its recommendation to convert the funds to a CD and he agreed with it. Mr. Piascik denies that any such conversation ever transpired. To the contrary, Mr.

Piascik's denies being consulted by Bank of America regarding this decision but recalls Bank of America unilaterally deciding it would terminate its relationship with Mr. Alexander if he were to pay off the LOC.

72.     Alternatively, Mr. Alexander queried Johnson about the possibility of using the proceeds from his home refinance to apply to the LOC to reduce the monthly interest payment. Johnson suggested that this idea may be plausible and that it may be best for Mr. Alexander to discuss this option with Mr. Piascik.

73.     On September 4, 2007, Mr. Alexander was advised that his trust account funds were available to him in a newly established money manager account. There was over $2.3 million in the new account, $2 million of which was in the form of a certificate of deposit which, as per Ms. Johnson's admonition, could not be withdrawn because it secured the LOC.

74.     To justify its repeated deterrence of Mr. Alexander's efforts to pay off the LOC, Johnson and Bank of America advised Mr. Alexander that, due to his lack of income, he needed cash in the Bank in order to collateralize the refinance of his home.

75.     Meanwhile, Mr. Alexander used the disposable cash in his money manager account to resolve outside debts in order to refinance his home.  He also took care of the payments, legal fees and related costs associated with his divorce settlement as well as invested in further home improvements to enhance the value of his property for purposes of refinancing in reliance upon Johnson and Bank of America's promise to refinance his home mortgage thereafter.

76.     Mr. Alexander's investment advisors were well aware of these expenditures and encouraged him to utilize the cash available in his money manager account for these purposes.

77.    In December 2007, Bank of America appraised Mr. Alexander's home for $950,000. According to Bank of America's appraisal, Mr. Alexander had $700,000 in home equity, as the only encumbrance against the property was the HELOC. Bank of America's appraised value of Mr. Alexander's home did not include the value of an adjacent one acre parcel that Mr. Alexander owned free and clear of any liens.

78.    Bank of America denied Mr. Alexander's refinance loan application a little later in December 2007 notwithstanding the amount of equity in Mr. Alexander's home and the Bank's and Johnson's prior assurances regarding Mr. Alexander's receipt of approval for refinancing.

79.    Bank of America's ostensible reason for denying the loan was the inadequacy of Mr. Alexander's income which cannot be reconciled with the grossly negligent advice Mr. Alexander was receiving throughout the entire process from Johnson. The sole reason Mr. Alexander did not pay off the LOC with the funds from his trust account was so that he could have adequate cash on reserve to qualify for a refinanced mortgage loan.

80.    By January 2008, Mr. Alexander was able to secure a loan from Wachovia to pay off the HELOC with Bank of America. By mid-February 2008, he paid off the LOC from the funds in his money manager account. Between August 2007 and mid-February 2008, Mr. Alexander incurred substantial finance charges on the LOC that he would not have incurred had he paid it off in August 2007. Mr. Alexander delayed paying off the LOC as a direct result of Defendants' willful violations of their contractual and fiduciary obligations and the applicable professional standards governing the provision of wealth and property management services.

81.    By mid-February 2008, Mr. Alexander did not have sufficient funds remaining in his money manager account, or elsewhere, to pay Bank of America the interest fees that had

20

continued to accrue from the LOC. These interest fees were automatically withdrawn from the Alexander Holdings account during the time Mr. Alexander was awaiting approval of his refinance loan application. The Alexander Holdings account did not have sufficient funds to cover the interest payments and consequently Bank of America was applying overdraft fees to the account unbeknownst to Mr. Alexander.

82.     Once the LOC interest and overdraft fees accrued to approximately $84,000, Bank of America contacted Mr. Alexander and recommended he convert these fees into a loan that Mr. Alexander would pay in full upon the sale of the Broad Street Building. The $84,000 in interest fees from the LOC and overdraft fees were converted into a loan in April 2008.

83.     Because the Broad Street Building had not sold due to the Bank's and Mobley's gross violation of their contractual and common law duties, the Bank began to pressure Mr. Alexander to pay additional money to extend the due date of the loan. However, by this time, Mr. Alexander was in extreme financial distress and did not have the funds to renew the loan terms, which would extend the due date.

84.     Bank of America's denial of Mr. Alexander's mortgage loan application caused him severe financial problems as it left him cash poor and unable to take care of mounting business and personal debts. Mr. Alexander's financial problems were exacerbated by the grossly negligent and self-serving financial advice of Johnson and others on his private wealth management team who convinced him to continue to pay exorbitant interest on the LOC instead of paying off the LOC following the liquidation of the trust account.

85.     Defendants' willful misconduct forced Mr. Alexander to avert financial insolvency by depleting his retirement funds and underselling his personal property and real estate, to include the Broad Street Building.

86.     Mr. Alexander independently found a buyer to purchase the Broad Street Building on June 3, 2009 for $1.2 million to avoid the foreclosure proceedings that had been initiated by Consolidated.  Mr. Alexander recouped nominal or no profit from the sale of the Broad Street Building after paying off the outstanding mortgage loan and Consolidated's foreclosure costs.

87.     Meanwhile, Mr. Alexander offered to enter into a payment plan with Bank of America which he would secure by encumbering three properties that he managed to maintain ownership of through his financial distress.  Despite Mr. Alexander's repayment proposal, Bank of America filed a lawsuit and ultimately obtained default judgment against Mr. Alexander and his businesses on October 2, 2009 in the amount of $84,049.30 in compensatory damages; $11,462.23 in contractual interest; $13,231.56 in attorneys' fees; and $386.67 in court costs.

88.     To date, this judgment has not been satisfied.

## COUNT I – PROFESSIONAL MALPRACTICE

89.     Plaintiffs restate and incorporate herein the allegations set forth above in paragraphs 1 through 88.

90.     A fiduciary relationship existed between Mr. Alexander and the persons assigned by Bank of America to render Mr. Alexander private wealth management services to include, without limitation, defendants Mobley and Johnson, who acted at all times relevant to this dispute as agents and/or employees of Bank of America functioning within the scope of their employment related duties.

91.     Mr. Alexander executed the Services Agreements and further agreed to pay Bank of America $1,000 per month to manage the Broad Street Building because Bank of America led him to believe that Johnson, Mobley and its other private wealth management professionals would exercise the knowledge, skill and care ordinarily employed by registered investment

22

advisors, wealth management strategists, property managers and other similarly situated professionals in the financial services field by:

(1) becoming intimately familiar with his specific financial needs and objectives and providing him with sound professional advice concerning the maintenance and allocation of his financial resources;

(2) providing him with guidance as to how to effectively manage his various business ventures, to include the management and disposition of his real estate holdings;

(3) insuring that he receive funding through personal and commercial loans to adequately manage and maintain his various assets and businesses; and

(4) assisting him with fulfilling his primary objective of developing and maintaining a reliable source of income following his retirement from professional basketball.

92. In lieu of upholding these minimal professional standards as promised, Defendants deviated from their fiduciary and contractual obligations and the applicable care standard in that they purposefully failed to disclose material information, provided grossly substandard services and advice and engaged in a pattern of self dealing to advance their own pecuniary interests at Mr. Alexander's expense.

### Violation of Disclosure Obligations

93. In accordance with applicable professional standards, Defendants, as Mr. Alexander's fiduciaries, were obligated to disclose all things within their knowledge that may have affected Mr. Alexander's decisions with respect to the management and allocation of his financial resources and real estate holdings.

94. The Bank and Johnson violated the duties owed Mr. Alexander by failing to fully disclose their concerns regarding the fulfillment of Mr. Alexander's request for refinancing with respect to his Goochland home.

95. Johnson and the Bank's other wealth management professionals led Mr. Alexander to believe that refinancing his Goochland home would help stabilize his financial situation following his retirement from professional basketball.

96. Johnson and the Bank's other wealth management professionals further led Mr. Alexander to believe that for him to qualify for refinancing he would have to keep adequate cash reserves in the Bank in order to fulfill the Bank's collateralization requirements for a refinance mortgage loan.

97. Consequently, Mr. Alexander kept the funds in his trust account in lieu of liquidating the trust account and selling the securities Mr. Alexander owned to pay off the balance of the LOC and stem the imposition of further interest charges and overdraft fees.

98. By Johnson and its other wealth management professionals deterring Mr. Alexander from paying off the LOC, Bank of America was able to generate additional income from the interest earned from the LOC and the reinvestment of the funds on reserve in Mr. Alexander's trust account.

99. Meanwhile, Johnson and the other members of Mr. Alexander's wealth management team purposefully concealed their knowledge of the Bank's inclination to decline Mr. Alexander's application for a refinanced mortgage notwithstanding Mr. Alexander's compliance with their request to keep funds on reserve in his trust account.

100. Had Mr. Alexander been made aware of the Bank's inclination to deny his loan application, he would have liquidated his trust account to pay off the LOC and refrained from

investing any further money to enhance the value of his Goochland home for purposes of the proposed refinance.

101.    Due to Johnson's and the Bank's other wealth management professionals' failure to make the requisite disclosures in comport with applicable industry standards, Mr. Alexander left the LOC open, resulting in the imposition of further interest charges and overdraft fees which ultimately led Bank of America to pursue and obtain a money judgment against Mr. Alexander and his various businesses for outstanding fees and charges that remained in tact after the LOC was finally paid off. Moreover, the Bank's denial of Mr. Alexander's request for refinancing left Mr. Alexander on the brink of insolvency, cash poor and unable to address mounting debt obligations.

102.    Mobley and Bank of America violated their disclosure obligations to Mr. Alexander by failing to apprise him of facts indicative of WAWA's heightened commitment to acquiring the Broad Street Building upon completion of its due diligence.

103.    Neither Mobley nor any other member of Mr. Alexander's wealth management team informed Mr. Alexander of WAWA's willingness to pay a non-refundable deposit as a condition for the purchase of the building; these defendants knew or should have known said willingness to pay a non-refundable deposit was highly indicative of WAWA's desire to effectuate the proposed sale transaction.

104.    On information and belief, Mr. Mobley was aware that WAWA had completed a crime survey prior to issuing its letter of intent, yet he failed to disclose this fact to Mr. Alexander nor the significance of WAWA conducting this preliminary due diligence as an additional indicator of WAWA's keen interest in acquiring the Broad Street Building.

105. Mobley failed to adequately apprise Mr. Alexander of WAWA's interest in acquiring the Broad Street Building, and as a direct result, Mr. Alexander did not know how vitally important it was to negotiate an option agreement with WAWA for the acquisition of the property.

106. By failing to negotiate a sale contract with WAWA, Mr. Alexander lost an excellent opportunity to achieve his stated goal of selling the Broad Street Building to a corporate entity for a sizeable profit. Instead, Mr. Alexander ended up selling the property roughly eighteen (18) months after Mobley's receipt of WAWA's letter of intent well below market value in a distressed sale that occurred during a depressed economic climate to stem foreclosure proceedings initiated by Consolidated.

107. Instead of making in excess of $1,000,000 profit from the sale of the Broad Street Building, Mr. Alexander barely made enough money from the sale of the property to pay off the balance of the mortgage loan and the lender's foreclosure costs.

### Failure to Render Competent Professional Services and Advice

108. From the outset, Defendants were fully apprised of Mr. Alexander's long term financial goals and objectives. Mr. Alexander told the members of his wealth management team that his primary objective was to establish a sustainable source of income following his retirement from professional basketball.

109. Johnson, Mobley and other members of Mr. Alexander's wealth management team knew that Mr. Alexander wished to obtain his stated financial goals through the establishment of a lucrative real estate portfolio. Johnson, Mobley and the other wealth management team members knew that to develop this portfolio Mr. Alexander would have to effectuate the sale of the Broad Street Building for a sizeable profit.

26